UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUTVIJA KATICA,                    )
    Plaintiff,                     )
                                   )
                                   )
          v.                       ) C.A. NO. 13-cv-30072-MAP
                                   )
WEBSTER BANK, N.A.,                )
    Defendant.                     )


MEMORANDUM & ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 31)

July 18, 2014

PONSOR, U.S.D.J.

I.   INTRODUCTION

Plaintiff Lutvija Katica has brought suit in eight
counts against her former employer, Defendant Webster Bank.
She has asserted claims under the Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq., and
Mass. Gen. Laws. ch. 151B, for disability discrimination,
pregnancy discrimination, national origin discrimination,
and retaliation.  On April 11, 2014, Defendant filed the
pending Motion for Summary Judgment.  (Dkt. No. 31.)
Because a genuine dispute of fact exists with respect to
Plaintiff's claim that she was denied a promotion for

improper reasons, the court will deny Defendant's motion as to counts IV and VI on that limited theory.  However, since Plaintiff cannot succeed on any other claim, the court will allow the balance of Defendant's motion.

## II.  BACKGROUND FACTS[1]

Plaintiff, Lutvija Katica (a/k/a "Seka"), was born in Bosnia and came to the United States in 2000.  Defendant, Webster Bank, is a national bank with its main office in Waterbury, Connecticut.  Plaintiff began working for Defendant on October 4, 2010, as a "floating" branch customer service representative at twelve banking centers in Springfield, Massachusetts.  Angela Chirico, Defendant's Senior Vice President, oversaw the Springfield market, and Adam Cherry served as Plaintiff's human resources ("HR") contact.

In 2011, Plaintiff was pregnant with her second child. During her pregnancy, Plaintiff was occasionally denied the ability to use the restroom despite an increased need to do so.  Her supervisors also required her to bend and lift

---

[1] Unless otherwise noted, the facts are drawn from Defendant's Statement of Material Facts (Dkt. No. 32), Plaintiff's Response to Defendant's Statement of Material Facts (Dkt. No. 44), and the documents referenced therein.

heavy items in spite of the fact that her pregnancy made this difficult, and on one occasion her immediate supervisor, Ms. Debra Lizon, called her "huge." (Katica Dep. I 65:22-23, Dkt. No. 44, Ex. 4 at 18.) During this time, Plaintiff also attempted to wear certain maternity apparel, such as open-toe shoes, but her supervisors required her to change into less comfortable clothes that conformed to Defendant's requirements for attire.

Plaintiff gave birth on August 20, 2011. During her delivery, she experienced a back injury and, subsequently, suffered from postpartum depression. Consequently, she took a leave of absence that Defendant approved through October 3, 2011. Plaintiff sought an extension of her leave, which Defendant approved through November 1, 2011.

During this leave, Plaintiff applied for a vacant customer service representative position with Defendant. The position did not involve an increase in pay, and Plaintiff even would have lost money to cover her transportation expenses. Nonetheless, the new job would have allowed her to work at a single branch, and it could

have opened up more opportunities to advance within the company.[2]

Although Plaintiff was expected to return to work on November 1, 2011, she requested another extension of her leave at that time.  In support of that request, Plaintiff's chiropractor provided a note stating, "The patient may return to work on November 8, 2011, without restrictions." (Dkt. No. 32, Ex. 5 at 20.)  However, Defendant took the position that, due to understaffing, it needed to fill the "float" position.  Mr. Cherry informed Plaintiff that Defendant would advertise the position, but she could return before it was filled.  Plaintiff testified that Mr. Cherry, in threatening tones, urged her to return to work immediately.  (Katica Dep. II 42:2-8, Dkt. No. 44, Ex. 5 at 13.)

Plaintiff did resume work on November 8, 2011.  When she did, Defendant began accusing her of making errors.

---

[2]  Plaintiff also applied for a vacant senior teller position around the same time.  It is undisputed that Ms. Chirico told Plaintiff that she did not have the requisite experience to be promoted to a senior teller job.  It is also undisputed that Plaintiff did not, in fact, have the necessary qualifications required for that position.  In the end, she did not receive the promotion.

4

These included: cashing post-dated checks, cashing a check without a proper endorsement, and making "batching" mistakes. Plaintiff denied these accusations. In her view, her managers and co-workers were simply, and increasingly, rude to her, even expressing objections when she needed to go to the restroom to use a breast pump. They even, according to Plaintiff, flatly denied her the opportunity to use the restroom on several occasions.

On November 22, 2011, Ms. Chirico met with Plaintiff to talk about her mistakes. They also discussed the position Plaintiff applied for. According to Plaintiff's testimony, Ms. Chirico stated that Plaintiff would not get the customer service representative job because of her language skills, her accent, and her constant need to use the restroom. Defendant denies that Ms. Chirico made this statement.

Three days later, Plaintiff sent an e-mail to Mr. Cherry referring to the meeting with Ms. Chirico. Plaintiff complained about a general lack of opportunity to advance and stated that she felt people were treating her poorly because she was a breast-feeding mother. She did not, however, recount Ms. Chirico's alleged statements.

As a result of this meeting, Mr. Cherry investigated Plaintiff's complaints. Plaintiff, during the investigation, described co-workers' facial expressions and stated that she believed people constantly stared at her. She also repeated her charge that her access to the restroom was unduly limited. Mr. Cherry ultimately concluded that the Springfield staff was fine with Plaintiff using the restroom as often as she needed, but, like every other employee, Plaintiff needed to obtain coverage at the teller line before she stepped away. On December 16, 2011, Plaintiff and Mr. Cherry discussed the matter, and Plaintiff informed him that the situation had improved.

On December 28, 2011, a customer at the Vernon banking center spoke with Karen Green, an Assistant Manager, about an employee named "Seka." The customer stated that she went to the bank on November 30, 2011, to deposit a check and the teller asked her multiple times if she wanted to open a new credit card. Defendant had offered a number of incentive plans to its employees. One such offer awarded an employee ten dollars for every customer he or she signed up for a credit card. The customer reported that, although she

indicated no interest in a new card, she still observed Plaintiff entering information into the computer. Feeling uncomfortable, the customer asked Plaintiff to print out what she was preparing. The customer kept the paper and wrote "told her did not want & did not sign"; "make sure not generated" and "hold until Feb 2012! Then shred." (Dkt. No. 32, Ex. 9 at 5.) Nonetheless, the credit card company later informed the customer that a credit card application had been submitted and was declined because her income was listed, incorrectly, at $10,000.

On January 4, 2011, Ms. Chirico, who had been on vacation at the time of the customer's complaint, returned to work and learned of the matter. She spoke with the customer, asked Ms. Green for information about the transaction, obtained the screen-shot of the application (which showed Plaintiff's name), and reviewed the customer's deposit slip, which carried the number of the cash register assigned to Plaintiff that day. Based on that information, Ms. Chirico concluded that Plaintiff was, in fact, the responsible teller. At that point, she discussed the matter with Mr. Cherry, and they determined that Plaintiff's

misconduct, if it had occurred, warranted termination. Nonetheless, they wanted to provide Plaintiff an opportunity to defend herself before they acted.

Plaintiff was on an unrelated medical leave from January 4, 2012, to February 20, 2012. When she returned to work, Ms. Chirico immediately approached Plaintiff about the credit card incident. Plaintiff denied the allegations, as she has continued to do during this litigation. It is undisputed that Ms. Chirico and Mr. Cherry made the final decision to terminate Plaintiff some time between roughly February 21 and February 29, 2012. (Dkt. No. 32, Ex. 5 at 52.) On February 29, 2012, Ms. Chirico and Mr. Cherry exchanged final drafts of the termination notice. (Id. at 54-56.) The only other person they consulted about the decision to terminate Plaintiff was Mr. Cherry's supervisor, Becky Lowry.

On February 28, 2012, Plaintiff arrived late to work. Her supervisor reprimanded her and asked her if she understood a recent change to her schedule. Plaintiff believed that she was asked this question solely because she was from another country. On March 1, 2012, around 11:30

a.m., Plaintiff sent Mr. Cherry an e-mail about that incident along with a general complaint about discrimination. (Supplemental Cherry Aff. ¶ 2, Dkt. No. 48, Ex. 1.)

On March 5, 2012, Ms. Chirico and Mr. Cherry terminated Plaintiff because of the credit card incident. Plaintiff asked if she could apply for a job in the future, and Mr. Cherry informed her that she was "free to apply for future employment." (Cherry Dep. 74:15-24 – 75:1, Dkt. No. 44, Ex. 2 at 21.)

In July 2012, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") for sex (pregnancy) discrimination; national origin (ethnicity) discrimination; retaliation; and harassment (gender/ethnicity) under Title VII and Mass. Gen. Laws Ch. 151B. On September 9, 2012, the EEOC issued a dismissal and right to sue notice. MCAD, on October 2, 2012, did the same. On December 20, 2012, Plaintiff filed a second complaint with the EEOC requesting dual filing with MCAD. At this point, she alleged disability discrimination.

The EEOC provided a second notice of a right to sue on January 15, 2012.

Plaintiff originally filed her complaint in state court, pursuant to chapter 151B, on February 19, 2013. On March 29, 2013, Defendant, invoking diversity jurisdiction, removed the case. (Dkt. No. 1.) Plaintiff, on April 2, 2013, filed an amended complaint asserting claims for: (I) discrimination under the ADA, 42 U.S.C. § 12101; (II) failure to provide a reasonable accommodation under the ADA; (III) retaliation under the ADA; (IV) gender, sex, and pregnancy discrimination in violation of chapter 151B; (V) disability discrimination in violation of chapter 151B; (VI) race, ethnicity, and national origin discrimination in violation of chapter 151B; (VII) retaliation-harassment in violation of chapter 151B; and (VIII) retaliation-termination in violation of chapter 151B. (Dkt. No. 3.)

On April 11, 2014, Defendant filed the pending Motion for Summary Judgment. (Dkt. No. 31.) Plaintiff, in her opposition, conceded that her disability-discrimination claims, Counts I-III and V were properly subject to dismissal. (Pl.'s Mem. Of Law in Opp'n 2, Dkt. No. 47.)

Counsel appeared for argument on the remaining counts on May 14, 2014, and the court took the matter under advisement.

### III.  DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences from those facts in that party's favor.  <u>Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.</u>, 369 F.3d 584, 588 (1st Cir. 2004).

Though Plaintiff does not oppose dismissal of her disability discrimination claims, she vigorously opposes Defendant's motion with respect to the remaining four counts.  Though the analysis will overlap at times, this memorandum will address each remaining one in turn.

### A.  <u>Count IV: Gender, Sex, and Pregnancy Discrimination</u>

Plaintiff raises one count of gender, sex, or pregnancy discrimination under chapter 151B.  She grounds this claim on two theories: hostile work environment and disparate treatment.  Because the parties primarily focus on the

hostile work environment contention, the court will address that argument first.

1. Hostile Work Environment

To establish the existence of a hostile work environment, Massachusetts law takes its cue from Title VII and requires a plaintiff to show that: (1) she is a member of a protected class; (2) she experienced uninvited harassment; (3) the harassment was based on sex;[3] (4) the harassment was so severe or pervasive as to create an abusive work environment; (5) the harassment was objectively and subjectively offensive; and (6) some form of employer liability exists. Douglas v. J.C. Penney Co., Inc., 422 F. Supp. 2d 260, 280 (D. Mass. 2006).

At summary judgment, the analysis typically hinges on whether the harassment was severe or pervasive. "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and

---

[3] Under state law, any classification based on pregnancy is a distinction based on sex. Mass. Elec. Co. v. Mass. Comm'n Against Disc., 375 Mass. 160, 167 (1978). The Supreme Judicial Court has also indicated that a lactating mother is provided the full protections of the anti-discrimination statutes. Currier v. Nat'l Bd. of Med. Exam'rs, 462 Mass. 1, 16 (2012).

actual harassment." Noviello v. Boston, 398 F.3d 76, 92

(1st Cir. 2005). Factors to consider include, "the severity

of the conduct, its frequency, whether it is physically

threatening or not, and whether it interfered with the

victim's work performance." Gerald v. Univ. of P.R., 707

F.3d 7, 18 (1st Cir. 2013). Although the inquiry is fact-

specific, a court has a duty to limit claims to those that a

reasonable juror could find to be hostile or abusive. See

Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st

Cir. 2006).

To support her claim that she experienced a hostile

work environment, Plaintiff alleges -- through her own,

fairly broad testimony -- five incidents of harassment. The

first four focus on her experience while she was pregnant.[4]

First, she contends that her supervisors gave her a

hard time about missing work for medical appointments during

her pregnancy. According to Plaintiff, her supervisors

---

[4] Defendant believes that these four assertions are
untimely. The court need not determine whether Defendant is
correct or whether the "continuing violation" doctrine
applies, see, e.g., Silvestris v. Tantasqua Reg'l Sch.
Dist., 446 Mass. 756 (2006), as Plaintiff cannot succeed
even if the court considers these events.

became upset and angry when Plaintiff requested time off. Consequently, Plaintiff had to schedule her appointments for non-work hours. (Katica Dep. I 103:2-10, Dkt. No. 44, Ex. 4 at 28.) Second, Plaintiff's supervisors denied her the ability to wear maternity clothes -- such as open-toe shoes -- during her pregnancy. When Plaintiff arrived to work in such outfits, her supervisors required her to change to comply with Defendant's requirements for attire. Third, on several occasions during her pregnancy, Plaintiff was told to lift heavy files or carry cash drawers. Though Plaintiff asked to be exempt from this work, those requests were rebuffed. Fourth, on one occasion, Ms. Lizon, Plaintiff's immediate supervisor, told Plaintiff that she looked "huge." (Katica Dep. I 65:22-23, Dkt. No. 44, Ex. 4 at 18.)

The final form of harassment Plaintiff discusses stems from the time after she gave birth and her associated need to use a breast pump. Though she discusses this period at a number of different places in her memorandum, her general complaint is that Defendant denied her the ability to use the pump at will and her co-workers negatively reacted to that need. Specifically, on at least five dates,

Plaintiff's supervisors denied her request to use the restroom.  On unspecified occasions, Plaintiff alleges that Defendant even denied Plaintiff her normal breaks.  On those instances where she was able to use the restroom, co-workers would often ask if she had permission to do so and would tell her to be quick.  It is conceded that these reactions usually coincided with an increase in the number of customers present at the bank.

Even crediting these allegations, two problems emerge.  First, the bulk of Plaintiff's allegations are essentially a reasonable accommodation claim recast under a hostile workplace label.  Had Plaintiff chosen to pursue her disability discrimination claims, they might possibly have formed the basis for a claim that Defendant had denied her an accommodation that would have allowed her to perform the functions of her job.  However, the picture painted by these allegations, unpleasant and distressing as it may appear, fails to depict a landscape of intimidation and humiliation required to constitute harassment.  See Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008)(stating that Massachusetts law defines a hostile work environment as one "pervaded by

harassment or abuse, with the resulting intimidation, humiliation, and stigmatization," limiting a plaintiff's ability to participate fully in the workforce)(internal quotations omitted).

The larger problem for Plaintiff -- assuming that all of the allegations were proved to be some form of harassment -- is that a reasonable juror simply could not conclude that the conduct in question was sufficiently severe or pervasive to rise to the level of a hostile environment.  Plaintiff's allegations focus on a matter of a few months, during several of which she was out of work on medical leave. Moreover, Plaintiff provides minimal, concrete evidence respecting the consistency of the alleged harassment.  The most frequent harassment she alleges is the multiple times Defendant denied Plaintiff permission to use the restroom. Even if the court assumes that the other problems Plaintiff describes occurred with similar frequency, they are still a far cry from a consistent form of conduct that can be deemed pervasive.  See Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002)(noting that twelve incidents over a five year span was not pervasive).

Absent allegations of pervasive conduct, Plaintiff must show that the actions were so severe as to alter the conditions of her employment. See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002). The harassment here, however, does not approach that threshold. Though Plaintiff's immediate supervisors may have treated her poorly, no individual ever threatened Plaintiff's physical well being, nor did she suffer from a consistent barrage of insults. At worst, her supervisors to some extent abused their authority, and her co-workers were rude to her. See Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46-47 (1st Cir. 2003)(stating that eradicating such conduct is not the goal of the anti-discrimination statute).

Particularly telling on the severity question is Plaintiff's failure to establish that the events "negatively affected her work performance." Medina v. Adecco, 561 F. Supp. 2d 162, 173 (D.P.R. 2008), citing Pomales, 447 F.3d at 83; Lee-Crespo, 354 F.3d at 46. Indeed, in contending that her termination was not related to her performance, as will be seen below, Plaintiff repeatedly argues that her work

remained consistent and never fell below an acceptable
level.

In the end, the evidence to support the claim that
Plaintiff experienced a hostile work environment cannot be
found in this record.

### 2. Disparate Treatment

In support of her claim for pregnancy discrimination
Plaintiff also offers a disparate treatment theory.  Absent
direct evidence, Plaintiff can make out a prima facie case
of disparate treatment by showing: "(1) she was pregnant at
the relevant time, (2) her performance was satisfactory, but
(3) her employer nevertheless took some adverse employment
action against her while, (4) treating non-pregnant
employees differently."  Gorski v. N.H. Dep't of Corr., 290
F.3d 466, 475 (1st Cir. 2002).  If Plaintiff makes out a
prima facie case, the burden of production shifts to
Defendant to offer a legitimate, non-discriminatory reason
for the adverse employment action.  Benoit v. Technical Mfg.
Corp., 331 F.3d 166, 173 (1st Cir. 2003)(noting that the
McDonnell Douglas framework applies to claims under chapter
151B).  If Defendant carries this burden, the ultimate

burden of persuasion rests with Plaintiff to show that Defendant's proffered reason was a pretext for discrimination.

Plaintiff believes she was treated adversely in two ways. First, she argues she was terminated because of her need to use a breast pump post-pregnancy. On this point, it is questionable whether Plaintiff has satisfied her prima facie burden given the dearth of evidence indicating that non-breast-feeding employees were given more generous opportunities to use the restroom than Plaintiff was. Nonetheless, the court will assume for purposes of the motion that Plaintiff has established her prima facie case.

Relying on that assumption, the burden of production shifts to Defendant to provide a legitimate, non-discriminatory reason for its decision to terminate Plaintiff. That burden is not onerous, Espinal v. Nat'l Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 292 (D. Mass. 2011), and Defendant undoubtedly satisfies it in this case. Defendant has provided evidence supporting its claim that it terminated Plaintiff for signing a customer up for a credit card against that individual's express wishes. (Dkt. No.

32, Exs. 5, 8, & 9.)  This was in direct violation of Defendant's policies, and Defendant chose to respond by terminating Plaintiff.

Since Defendant has met its burden, the <u>prima</u> <u>facie</u> case vanishes, and Plaintiff's claim hinges on the final step of the analysis.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993).  Here, the question is whether Plaintiff has presented evidence to raise a genuine issue of material fact that Defendant's proffered reason was a pretext for discrimination.  Plaintiff provides four arguments.[5]

Plaintiff's predominant argument is that, despite Defendant's allegations, she did not sign a customer up for a credit card against that individual's wishes.  However, even if, <u>arguendo</u>, Plaintiff convinced a jury that she was not the individual responsible for the credit card transaction, Defendant's good faith, but mistaken, belief would still constitute a legitimate reason for the

---

[5] Plaintiff breaks these arguments into a number of different categories.  The court has considered each and, to the extent they have potential merit, incorporated them into these four contentions.

termination.  <u>Ronda-Perez v. Banco Bilbao Vizcaya</u>
<u>Argentaria—P.R.</u>, 404 F.3d 42, 45 (1st Cir. 2005)(noting that
the question is not whether the proffered reason is false,
but whether the employer actually believed it to be real).
Critically, no evidence intimates any bad faith on
Defendant's part.

Plaintiff also questions the timing of the termination.
The event occurred in November 2011, but Defendant did not
terminate her until March 2012.  This gap, Plaintiff says,
implies that the credit card transaction was not the real
reason for the decision.  However, the <u>undisputed</u> evidence
explains the interval.  The customer did not complain until
the end of December, at which point Ms. Chirico was on
vacation; Plaintiff was then out on medical leave; the
problem was swiftly addressed upon Plaintiff's return.  In
sum, the "delay" argument is specious.

Next, Plaintiff contends that Defendant had discretion
in how to reprimand Plaintiff; termination was not required.
However, the mere existence of discretion, absent any other
evidence of discrimination, is not sufficient to create a
material question over pretext.  <u>Cf</u>. <u>Tex. Dep't of Cmty.</u>

Affairs v. Burdine, 450 U.S. 248, 259 (1981)(noting that an
employer generally has discretion to act and can do as it
pleases so long as it does not make a decision based on an
unlawful criterion).

Finally, Plaintiff emphasizes Mr. Cherry's statement at
the time of Plaintiff's termination.  He allegedly said, "I
told her she was free to apply for future employment."
(Cherry Dep. 74:24-75:1, Dkt. No. 44, Ex. 2 at 21.)  This
statement, Plaintiff insists, is inconsistent with a
termination based on performance-related issues.  However,
although the court must draw inferences in Plaintiff's
favor, it is only required to do so if it would be
reasonable and "can be drawn from the evidence without
resort to speculation."  Mulero-Rodriguez v. Ponte, Inc., 98
F.3d 670, 672 (1st Cir. 1996).  Here, the remainder of Mr.
Cherry's testimony makes the requested inference
impermissible.  (Cherry Dep. 74:16-18, Dkt. No. 44, Ex. 2 at
21 ("She had asked if she would be eligible to be rehired at
Webster.  I replied she is free to apply to open
positions."); Cherry Dep. 74:22-24 - 75:1 ("Q: So you told
her you would consider her for future employment? A: I

Didn't. I told her she was free to apply for future
employment."); Cherry Dep. 75:23-24 – 76:2-4 (Q: Why would
you tell her she could apply? A: Because she has every right
to apply.  It doesn't mean we are going to select her.");
Cherry Dep. 76:20-22 ("She asked if she was able to apply
for other positions.  I told her she was.").)  The only
inference that can be drawn is that Mr. Cherry would not --
indeed, could not -- prohibit Plaintiff from applying for a
position with Defendant in the future.  Plaintiff's argument
on this point again amounts to nothing.

     In sum, Plaintiff has failed to provide evidence that
would allow a reasonable juror to conclude that Defendant's
proffered reason for terminating her was a pretext for
discrimination.

     Plaintiff has a second disparate treatment argument.
She avers that she was denied the customer service
representative position on account of her pregnancy.  Two
disputed issues of fact allow this very limited claim to
move forward.

     First, the parties dispute whether the customer service
representative position constituted a promotion.  Defendant

argues that Plaintiff would have received the same pay and would have actually lost her mileage expense. Therefore, the job should not be considered a promotion. Plaintiff, meanwhile, focuses on the convenience of working at one office and the corresponding opportunities to advance in the corporation.

If a jury were to accept Plaintiff's arguments, it could view the increase in status or the convenience to Plaintiff as a material increase in benefits, thus making the job change tantamount to a promotion. At a minimum, it would constitute a transfer to a different position. Either is considered an actionable, employment decision. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).

The other disputed issue of fact relates to causation. Defendant contends that Plaintiff was not selected for the customer service representative position because of her performance issues following her return from maternity leave. Plaintiff, however, testified under oath -- though less clearly than with respect to her national origin claim, discussed in the section below -- that Ms. Chirico denied Plaintiff the promotion because of her need to use a breast

pump.  (Katica Dep. I 136:17-18, Dkt. No. 44, Ex. 4 at 36

("What she was telling me was based on my taking too much

time to breast pump."); Katica Dep. I 140:20-22 ("I was a

breast feeding mother and I had to take too much time out of

teller and go breast pump.").)

Reading Plaintiff's testimony generously, she provides

a statement by a decisionmaker connecting an adverse

employment action with discriminatory intent.  When evidence

"consists of statements by a decisionmaker that directly

reflect the alleged animus and bear squarely on the

contested employment decision," it is considered direct

evidence.  <u>Febres v. Challenger Caribbean Corp.</u>, 214 F.3d

57, 60 (1st Cir. 2000)(citations omitted).  The presence of

such direct evidence is sufficient to generate a jury issue

on the question of a possibly improper mixed-motive on

Defendant's part.  <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228

(1989).  Once a plaintiff demonstrates discrimination as a

motivating factor under the mixed-motive framework, the

burden of persuasion shifts "to the employer, who then must

establish that he would have reached the same decision

regarding the plaintiff even if he had not taken the

proscribed factor into account." <u>Febres</u>, 214 F. 3d at 60
(citation omitted); <u>see</u> <u>also</u> <u>Wynn & Wynn, P.C. v. Mass.</u>
<u>Comm'n Against Discrimination</u>, 431 Mass. 655, 669 (2000),
<u>overruled on other grounds by</u> <u>Stonehill Coll. v. Mass.</u>
<u>Comm'n Against Discrimination</u>, 441 Mass. 549 (2004).

Here, if a jury accepted Plaintiff's testimony, it
would constitute direct evidence of discrimination, and
would satisfy Plaintiff's burden.  The burden would thus
shift to Defendant to show that it would have denied her the
new job regardless of her need to use a breast pump.
Because that question is one of fact, this claim must go to
a jury.

Ultimately, Plaintiff's claim for pregnancy
discrimination cannot move forward on her hostile work
environment theory or her claim that she was terminated for
discriminatory reasons.  However, she does have a right to
have a jury weigh her claim that she was denied a promotion
on account of her pregnancy.

B.    <u>Count VI: National Origin Discrimination</u>[6]

---

[6] Plaintiff initially pled this as a race, ethnicity, and
national origin claim.  However, in opposing Defendant's
motion Plaintiff exclusively focuses on her claim for

Complementing her claim for pregnancy discrimination, Plaintiff provides two theories to justify her national origin discrimination claim: one based on a hostile work environment theory and one on disparate treatment. The court will again address each theory independently.[7]

### 1. Hostile Work Environment

The same standard previously discussed applies with equal force in this context. Here though, Plaintiff anchors her claim on <u>Navarro v. U.S. Tsubaki, Inc.</u>, 577 F. Supp. 2d 487 (D. Mass. 2008). In that case, a father, mother, and son, all of Mexican heritage, sued the same employer for, <u>inter alia</u>, national origin discrimination. <u>Id.</u> at 493-99. At summary judgment, it was undisputed that co-workers told the father "he should be picking watermelons . . . and described him as a monkey," that supervisors "referred to asking him for help as 'calling the Alamo,'" and that

---

discrimination based on her national origin.

[7] Defendant broadly argues that Plaintiff cannot proceed on these claims for failure to exhaust her administrative remedies. Contrary to Defendant's contention, Plaintiff included enough detail in her MCAD complaint to provide the institution with the information it needed to investigate the claim. (Dkt. No. 44, Ex. 7 at 3.)

co—workers repeatedly pretended not to understand the mother
because of her accent.  Id. at 510.  Moreover, the
plaintiffs alleged that they were subjected to racially
based taunts on a consistent basis for nearly six years.
Id. at 493-99.  Finally, in Navarro the plaintiffs were each
passed over for promotions and disciplined in ways that
their white counterparts were not.  Id.

Plaintiff contends that her case is analogous to
Navarro.  According to Plaintiff, Ms. Lizon ridiculed her
accent.  Another employee, Ms. Talbot, would laugh at
Plaintiff when she spoke or would criticize her for the way
she said certain words.  They would also repeat what she
said and mimic her accent.  On one occasion, she overheard
Ms. Talbot complaining about another employee with an
accent.  Finally, Plaintiff invokes the February 28, 2012,
incident where her supervisors asked her if she understood a
change in the attendance policy.

Navarro does not assist Plaintiff here.  In particular,
the plaintiffs there provided detailed evidence of specific
events over a substantial period of time.  Here, Plaintiff's
testimony consists solely of broad allegations of rude or

inappropriate behavior by two or three of her co-workers.
No details show that the incidents occurred on a consistent
basis, or that she suffered from an "increasingly difficult
environment."  O'Rourke v. City of Providence, 235 F.3d 713,
729 (1st Cir. 2001).  Moreover, no evidence suggests that
the harassment was particularly severe or longstanding, or
impacted her work.  Simply put, Plaintiff suffered from an
environment that was unpleasant perhaps, but not one that
was hostile.

        2.  Disparate Treatment

        Plaintiff again focuses on the two adverse employment
decisions -- her termination and the denial of a promotion
-- to form the basis of this disparate treatment claim.  To
succeed in showing that she was terminated on account of her
national origin, Plaintiff must show (1) she belonged to a
protected class; (2) she was performing her job at a level
that ruled out the possibility that she was fired for job
performance; (3) she suffered an adverse employment action;
and (4) her employer sought a replacement for her with
roughly equivalent qualifications or left the position
vacant.  Douglas, 422 F. Supp. 2d at 273.  The McDonnell

_Douglas_ burden-shifting framework, as previously described, applies once Plaintiff can make out her _prima facie_ case.

Plaintiff adequately establishes that she was in a protected class and that she was terminated. The court will assume that she performed her job responsibilities in an acceptable fashion. Notably, though, she does not provide evidence -- nor does she even argue in her memorandum -- that Defendant sought a replacement for her with roughly equivalent qualifications or that the position remained open. The failure to make out a _prima facie_ case is sufficient on its own to sink her claim. _See_, _e.g._, _Fields v. Clark Univ._, 966 F.2d 49 (1st Cir. 1992).

However, even if Plaintiff could make out her _prima facie_ case, the burden of production would shift to Defendant to provide a legitimate, non-discriminatory reason for its action. As discussed before, Defendant more than carries that burden since it terminated Plaintiff for the credit card incident.

The ultimate burden of persuasion thus rests with Plaintiff. Plaintiff presents the same, previously discounted, arguments to attack Defendant's justification.

Specifically, she again contends that she was not responsible for the credit card transaction, that Defendant had discretion in how to address the event, that the timing of events implied discrimination, and that Mr. Cherry informed her that she could reapply for a position with Defendant. As described above, each of these arguments has a fatal flaw rendering the evidence insufficient to allow a jury to conclude that Defendant's proffered reason was a pretext for discrimination.

As she did before though, Plaintiff points to a second, adverse employment action, the denial of a promotion to a customer service representative position because of her national origin. The evidence here is straightforward. According to Plaintiff, Ms. Chirico said that Defendant denied Plaintiff the promotion because of her national origin. (Katica Dep. I 137:2-5, Dkt. No. 44, Ex. 4 at 36 ("Q: Did she say to you the fact you were of a different national origin was the reason you didn't get the promotion. A: yes."); Katica Dep. II 108:14-21 ("Because she said that they had a better candidate and that other managers, that she talked to other managers about me and I am not a good

candidate about it and she told me because of my language .
. . because of my language skills and my accent."); Katica
Dep. II 107:19-22 ("Q: Who are you claiming at the Bank told
you you didn't get the promotion because of your accent and
language skills? A: Angie [Ms. Chircio] and Maureen.").)

Given this direct evidence of discrimination, the Price
Waterhouse mixed-motive framework governs the court's
response once again.  Plaintiff is entitled to present to a
jury her claim that her denial of a promotion grew out of
discrimination based on her national origin.

C.   Counts VII & VIII: Retaliation

Plaintiff's final two counts are for retaliation.
First, she contends that she was retaliated against by way
of harassment, count VII.  To show retaliatory harassment, a
plaintiff must establish: (1) she engaged in a legally
protected activity; (2) she was subjected to a hostile work
environment; and (3) there was a causal connection between
the two.  Colon-Fontanez v. Municip. of San Juan, 660 F.3d
17, 36 (1st Cir. 2011).

Plaintiff relies on the facts previously discussed in
connection with her hostile work environment claims to

support her claim of retaliation here.  However, as demonstrated previously, those events were not objectively severe or pervasive.  Summary judgment for Defendant is therefore appropriate on her claim of retaliation based on harassment.[8]

Plaintiff's second retaliation count is anchored on her termination, count VIII.  For her to succeed, she must first establish a prima facie case.  To do this, she must prove: (1) she engaged in protected conduct; (2) she suffered an adverse employment action (in this case, termination); and (3) the adverse employment action was causally connected to the protected activity.  Mole v. Univ. of Mass., 442 Mass. 582, 591-92 (2004).  If and when a prima facie case is made out, McDonnell Douglas places on Defendant the burden of production to provide a non-retaliatory reason for the adverse employment action.  Id. at 591.  Finally, Plaintiff bears the ultimate burden of persuasion to show that Defendant's proffered reason was a pretext for retaliation. Id.

---

[8] The absence of any causal connection between the protected activity and the alleged harassment would also defeat this claim.

In terms of her prima facie case, no dispute exists that Plaintiff engaged in a protected activity by complaining about discrimination.  Nor do the parties disagree that Plaintiff was terminated.  The parties contest the final element -- causation.

The only real evidence of causation Plaintiff can point to is the temporal proximity between events: she complained of discrimination on November 25, 2011, and March 1, 2012, and Defendant then terminated her on March 5, 2012.  Without considering Defendant's evidence at this stage, the extraordinarily close timing between Plaintiff's second complaint and her ultimate termination is sufficient to establish a prima facie case of retaliation.  See Mariani-Colon v. Dep't Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007); Furtado v. Standard Parking Co., 820 F. Supp. 2d 261, 273 (D. Mass. 2011).

The burden of production thus shifts to Defendant. Defendant's same legitimate reason for terminating Plaintiff, as previously described, satisfies this burden. One key, undisputed fact here is that Defendant made the

decision to terminate Plaintiff before February 29, 2012. (Dkt. No. 32, Ex. 5 at 52.)

The final burden of persuasion therefore rests with Plaintiff to show that Defendant's reason was a pretext for retaliation. She first relies on the same arguments provided earlier to establish pretext -- particularly focusing on her claim of innocence with respect to the credit card incident. For the reasons set forth above, these arguments are without merit.

Plaintiff also emphasizes the timing of events to show pretext. Temporal proximity alone can be sufficient to establish pretext, but only where it is strongly suggestive of retaliation. Henry v. United Bank, 686 F.3d 50, 57 (1st Cir. 2012). In this case, the termination decision undisputedly occurred before Plaintiff's second complaint. Plaintiff must therefore rely on the three-month gap between her initial complaint and the termination decision. That span, however, is not nearly close enough on its own to suggest pretext. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004)(one-month insufficient to show pretext.)

More broadly, the "surrounding circumstances undermine any claim of causation." Carrero-Ojeda v. Autoridad De Energia Electrica, -- F.3d --, 2014 WL 2786536 at *9 (1st Cir. June 20, 2014). No evidence traditionally used to show pretext, such as a statement by a decision-maker or evidence of similarly situated employees, exists in this record. See Colburn v. Parker Hannifan/Nichols Portland Div., 429 F.3d 325, 338 (1st Cir. 2005). Indeed, no evidence suggests that Defendant considered Plaintiff's complaint at all in its decision to terminate her. Absent any such proof, Plaintiff fails to create a genuinely disputed issue at this final step of the analysis. Accordingly, Plaintiff's final claim cannot survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 31) as to counts IV and VI, on the limited theory that Plaintiff was denied a promotion to a customer service representative position based on her pregnancy and national origin, is hereby DENIED. Defendant's motion is hereby ALLOWED as to all remaining counts.

The clerk shall schedule the matter for a final pre-trial conference on the two remaining claims.

It is So Ordered.

 /s/ Michael A. Ponsor  
MICHAEL A. PONSOR
U. S. District Judge
